**Lavon BRUMBACK, Plaintiff**

v.

**CALLAS CONTRACTORS, INC., Defendant.**

**Civil No. AMD 94–3527.**

United States District Court, D. Maryland.

Nov. 29, 1995.

Charles Leon Fuller, Columbia, MD, for plaintiff.

William McC. Schildt, Strite & Schildt, Hagerstown, MD, for defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

### I. Introduction

The Plaintiff, Lavon Brumback, an African–American male, worked as a small equipment mechanic for the Defendant, Callas Contractors, Inc., ("Callas Contractors") from August 1986 until July 13, 1993. Brumback alleges that from approximately April 1992 until he was laid off in July 1993, he worked in an abusive environment permitted to exist by Callas Contractors in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. As a result, Brumback claims to have suffered emotional and psychological damage. In addition, the Plaintiff contends that the Defendant's alleged reason for laying him off in July 1993—lack of work—was pretextual, and that its real motivation for letting him go was to retaliate against him for filing a discrimination complaint against it with the Maryland Commission on Human Relations.[1]

Before this Court, Brumback has filed a four count complaint alleging various violations of Title VII, negligent hiring/retention and intentional infliction of emotional distress. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Currently pending before the Court are the Defendant's Motion for Summary Judgment and the Plaintiff's Motion to Deny or Dismiss the Defendant's Motion for Summary Judgment as Untimely Filed. This Court has considered the parties' memoranda and exhibits, and no hearing is deemed necessary. Local Rule 105.6 (D.Md.1995).

### II. Motion to Strike

As a preliminary matter, this Court will consider the Plaintiff's Motion to Dismiss the Defendant's Motion for Summary Judgment as Untimely Filed. As the Plaintiff's motion does not consider the merits of the Defendant's motion, but rather seeks adjudication based on a procedural defect, the Plaintiff's motion to "dismiss" shall be treated as a motion to strike pursuant to Fed. R.Civ.P. 12(f).

The facts relevant to the motion are as follows: In this Court's initial scheduling order all motions for summary judgment were to be filed with the Court by July 3, 1995. In its Amended Scheduling Order that date was extended to August 31, 1995. On August 30, the Defendant filed a motion requesting an extension of time to file its motion for summary judgment. This Court granted the Defendant's motion, and extended the filing deadline to September 15, 1995. Nevertheless, the Defendant failed to file its Motion for Summary Judgment with the Court until September 19, 1995.

Brumback argues that in light of the circumstances (including the fact that Defendant's counsel took a vacation during the month of August) the Defendant forfeited its

---

1. The Maryland Commission on Human Relations is authorized to investigate complaints of unlawful discrimination in the workplace. See generally Md.Code Ann. Art. 49B, §§ 1–4, 9–18 (1994 Repl.Vol. & 1995 Supp.).

right to have its motion considered by the Court. Furthermore, the Plaintiff contends that if the Court denies his motion, it "will place an undue burden and expense on the Plaintiff." Pl.'s Mot. to Deny or Dismiss Df.'s Mot. for Summ.J. ¶ 15. Presumably, such burden and expense would be the result of "responding" to the Defendant's motion for summary judgment. *Id.* ¶ 14.

■ First, the Plaintiff's argument that he would be saved the undue expense of responding to the Defendant's motion for summary judgment is wholly undercut by his subsequent filing of a supplemental motion opposing the Defendant's summary judgment motion only seven days after he filed his purported motion to "dismiss." Thus, whatever "savings" there may have been have since disappeared, rendering such contention moot. Furthermore, the expense and burden of proceeding to trial would certainly be more burdensome in matters of time, effort and expense to the Plaintiff, than if this Court deemed it appropriate to grant the Defendant's Motion for Summary Judgment. In addition, as the Defendant pointed out in its response, "[m]otions for summary judgment are favored." Pl.'s Mem. in Resp. to Mot. to Deny and Dismiss Df.'s Mot. for Summ. J. as Being Untimely Filed at 2. As the Supreme Court explained in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citations omitted), "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *See also, e.g., Bland v. Norfolk and Southern R.R. Co.*, 406 F.2d 863, 866 (4th Cir.1969) ("Summary judgment is to avoid a useless trial.").

This Court perceives no advantage to it or to the parties, where it has not been presented with any evidence of actual prejudice to the Plaintiff, to disregard the Defendant's motion for summary judgment because of a four day delay in filing. Although this Court is certainly displeased with the Defendant's failure to comply with this Court's deadlines, notions of judicial economy and fairness mili-

tate against a harsh response under the present circumstances. Accordingly, Plaintiff's motion shall be denied, and the merits of the Defendant's motion for summary judgment shall be reviewed.

### III. Summary Judgment

■ Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If "the evidence [is] so one-sided that one party must prevail as a matter of law," this Court must grant summary judgment in that party's favor. *Id.* at 268, 106 S.Ct. at 2520. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). *See also Podberesky v. Kirwan*, 38 F.3d 147, 157 ("A district court may not resolve conflicts in the evidence on summary judgment motions...."), *reh'g, en banc, denied*, 46 F.3d 5 (4th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995).

■ Mere speculation cannot stave off a properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). To survive a motion for summary judgment, a party may not rest on its pleadings, but must demonstrate that specific, material facts exist which give rise to a genuine issue. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. In ruling on a motion for summary judgment, the Court assumes that all of the non-moving party's evidence is worthy of belief, and all justifiable inferences are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Only when "the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party," can the Court grant a motion for summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Nonetheless, "a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial." Wright, Miller & Kane, *Federal Practice and Procedure Civil.2d* § 2725, at 104–05 (2d ed.1993).

## A. The Facts

 As this case is presently before this Court on the Defendant's motion for summary judgment, the Court "will present [Brumback's] version of the facts wherever the parties' evidence conflicts, at least to the degree that [his] allegations have support in affidavits, depositions or other documentary evidence." *Paroline v. Unisys Corp.*, 879 F.2d 100, 102–103 (4th Cir.1989), *vacated in part and rev'd in part on other grounds per curiam*, 900 F.2d 27 (4th Cir.1990) (en banc).

Brumback began working for Callas Contractors as a small equipment mechanic in August 1986. His daily tasks entailed repairing and servicing small equipment and cars. Up until at least January 1993, Brumback's job performance and attendance were perceived by his superiors as satisfactory.

In January 1993, Allen Hammond, who had been working for the Defendant as a heavy equipment and big truck mechanic since April 1992, was appointed to be the main shop foreman by Mike Callas, the Defendant's President. As shop foreman, Hammond reported directly to John Moser, Callas Contractors' equipment manager. Hammond "overs[aw] the day to day operations of the shop," including distribution of equipment for repair to the mechanics and helping other mechanics who were experi-

encing difficulty. Pl.'s J. Moser Dep. at 9–10.[2] One of the employees over whom Hammond had supervisory authority was the Plaintiff. *Id.*

The Plaintiff contends that beginning in April 1992, when Hammond began working at Callas Contractors, he suffered racial abuse. Although specific dates appear to escape the Plaintiff's memory, the first incident that he recalls took place in the Fall of 1992. Brumback testified at his deposition that he and Hammond were alone in the diesel shop, that Hammond lit a torch, soot came off the torch, and in response, Hammond said something akin to " 'Look at all them little nigger babies flying around through the air there.' " Pl.'s Brumback Dep. at 29–30.

The next significant incident occurred in the winter of 1992, around the Christmas holiday. The Plaintiff testified that Hammond had asked him about his plans for New Year's Eve. When the Plaintiff stated that he had no plans, Hammond suggested that Brumback go to Jonathan Street and "kill off all the niggers so we white people could have more." Pl.'s Brumback Dep. at 30.[3] According to Brumback, Elwood "Pee Wee" Robertson or Robinson, another Callas Contractors employee who worked in the shop area, witnessed this exchange. *Id.* at 31.

A short while after Hammond was appointed main shop foreman in January 1993, he became angry at the Plaintiff. Hammond obviously felt that Brumback was goofing off. He yelled at Brumback for "sitting there on your ass doing nothing," and then went into the office of Gary Moser, Callas Contractors' yard manager, to complain further about Brumback. The Plaintiff overheard Hammond talking to Moser, and he heard Hammond say something along the lines of " 'getting tired of that nigger in that shop doing

**2.** The parties apparently have used different transcribing services for some of their depositions. The result of having done so is that the page numbers on the parties' transcripts do not correspond; thus, necessitating that this Court qualify its citations as either the "Pl.'s" or the "Df.'s" in order to alert the parties as to whose version the Court is referring to at a given time.

Needless to say, the different pagination of the deposition transcripts was quite burdensome on

the Court in preparing this Memorandum. The parties are advised that such sloppy lawyering will not be tolerated in the future.

**3.** In his answers to the Defendant's first set of interrogatories, Brumback stated that Hammond had not said "kill," but rather "get drunk with the rest of the Niggers." Pl.'s Ans. to Df.'s First Set of Interog. at No. 10.B.

nothing. Either you do something about that nigger or I'm going to bust him upside his head....'" Pl.'s Brumback Dep. at 35.[4]

In addition, Brumback stated that other employees at Callas Contractors approached him to relate derogatory racial statements that were made by Hammond in reference to Brumback when he was not around. First, Brumback testified that Bill Calwell was privy to a conversation between Hammond and John Moser. Calwell allegedly told Brumback that out of that conversation came the following statement regarding Brumback as being "'a no good nigger and they was going to find a way to get rid of'" him. Pl.'s Brumback Dep. at 90. Dutch Berger, another Callas Contractors employee, also told Brumback that Hammond, in reference to a "cut off saw," had said that "'that looks like the work of that dumb nigger back in the shop....'" Id. at 95.[5]

Ronald L. Burger, one of the Defendant's employees, testified at his deposition with respect to another incident which he witnessed between the Plaintiff and Hammond. Burger had brought in a truck from a job site for repair. The Plaintiff stopped what he was doing and came over to work on Burger's truck. "Well, Mr. Hammond came in through the door, and said [to Brumback that he] was a dumb fucking nigger, he couldn't put a God damn bicycle together if

they had directions there for him. He went on, dumb nigger this, dumb nigger that." Burger Dep. at 21.[6]

Brumback testified that he spoke with Hammond's supervisors directly about Hammond's conduct towards him. In particular, he stated that he told John Moser that Hammond had been calling him a "nigger" and harassing him. Pl.'s Brumback Dep. at 40, 46. Although John Moser testified at his deposition that Brumback never complained to him about any problems that he was having with Hammond, Pl.'s J. Moser Dep. at 10, he nevertheless stated that he had approached Hammond about racially charged statements made to, or in reference to, the Plaintiff. Id. at 15–17; Pl.'s Hammond Dep. at 23–24. Hammond's testimony confirms that John Moser spoke to him and told him not to make racial comments, and that if he did, he would be terminated. Pl.'s Hammond Dep. at 24, 27. The Plaintiff also claims to have approached Gary Moser about Hammond. Gary Moser allegedly told the Plaintiff that it was his brother's responsibility, not his, to address such concerns, and that he would have nothing further to do with it. Pl.'s Brumback Dep. at 38. Nonetheless, Hammond testified that Gary Moser spoke to him in reference to racial statements that he had allegedly made to Brumback. Id. at 24. According to Hammond, Gary Moser only

---

4. George A. Lashley, another Callas employee, testified at his deposition to an incident which appears to be the same as the one testified to by Brumback. Pl.'s Lashley Dep. at 25. Lashley stated that he came upon a fight between Hammond and Brumback in the shop, after which he witnessed Hammond go into Gary Moser's office and say "'You'd better do something about that worthless nigger up there, you better do something or I am quitting.'" Id.

Lashley also testified to hearing Hammond say that Brumback was a stupid "nigger," and that everything Brumback works on "breaks down." Id. at 30. It is unclear from the record if Brumback was ever made aware of these comments. In addition, Lashley testified that Hammond stated that "he hated niggers ... constantly," and as a result he would occasionally just bother Brumback for the purpose of getting him angry. Id. at 38.

5. Brumback also claimed that he was being excluded by management from being permitted to keep his personal belongings on Callas Contrac-

tors' property, while white employees "were allowed to store some of their personal tools, equipment and property in the shop and yard areas with the approval of the Defendant." Pl.'s Compl. ¶ 23. The only evidence that the Plaintiff has presented in regard to this claim is his own testimony that one other employee was allowed to keep a crane on Callas Contractor's property. Pl.'s Brumback Dep. at 80.

6. There is also some evidence that, on occasion, Hammond called Brumback a "gnute." See Short Dep. at 17. This Court, unable to find a meaning for this word anywhere, believes that the word is supposed to be "newt," because of the definition given by the deposed witness. Id. ("a black lizard that swims at the bottom of the pond"). Merriam Webster's Collegiate Dictionary 782 (10th ed. 1993) defines a "newt" as "any of various small semiaquatic salamanders." A salamander, inter alia, is defined as "any of numerous amphibians ... superficially resembling lizards but scaleless and covered with a soft moist skin...." Id. at 1031. The probative value of this evidence is de minimis.

asked him if he had made the statements, to which Hammond had replied in the negative. *Id.* Gary Moser did not tell Hammond not to make such statements.

Finally, Brumback decided to file a formal complaint of discrimination with the Maryland Commission on Human Relations ("MCHR") on January 11, 1993. FEPA Charge No. 9301–0649. The MCHR sent a copy of the complaint to the U.S. Equal Employment Opportunity Commission ("EEOC") for concurrent processing (EEOC Charge No. 12F930253), as well as a copy to Callas Contractors. The complaint essentially stated that Hammond had been telling jokes about blacks and referring to Brumback as a "nigger," that Brumback had complained to his supervisors and that no action was being taken, and that he felt it was Hammond's goal to have him fired.

Callas Contractors allegedly received notice of the Plaintiff's complaint with the MCHR and the EEOC on Saturday, February 6, 1993. That following Monday, February 8, 1993, Michael Callas called a meeting with Hammond, John Moser and Jack Newkirk, Callas Contractors' Comptroller. "Hammond was warned not to make any such remarks again and that if he did there would be consequences." Newkirk Aff. ¶ 3.[7] In late April 1993, Callas became aware that Hammond had referred to one of the Defendant's secretaries as a "broad" or a "bitch." As a result, Hammond was immediately terminated. The reason for termination given in Hammond's personnel file is "harassment." Armstrong Aff. ¶ 4 & Attachment.

Three months after Hammond's termination, on July 13, 1993, John Moser notified the Plaintiff that he was being laid off due to lack of work. At his deposition, Brumback testified that in the last few months that he was on the job he was being assigned work assignments outside his classification, such as painting, making deliveries and stacking lumber, "while all [his] other work was being signed out to other people." Df.'s Brumback Dep. at 62–63. *See also* Df.'s J. Moser Dep. at 25. Brumback alleges that since he was laid off, Callas Contractors has hired a "white male ... to perform the work of the Plaintiff...." Pl.'s Compl. ¶ 26. At his deposition, Brumback testified that he had seen this individual riding around in the Defendant's trucks, and "in front of the shop working on automobiles." Pl.'s Brumback Dep. at 76. Ronald L. Burger, a former employee of the Defendant's, corroborates Brumback's claim that a man named "Jerry" was hired shortly after Brumback was laid off, that he was working at Brumback's former work station in the shop, and that he had only witnessed him performing tasks which fell into Brumback's former job description. Burger Dep. at 17–18.

As a result, Brumback believed that the reason for laying him off was pretextual. Therefore, he filed another complaint with the MCHR on December 3, 1993, alleging discrimination in violation of Title VII "with respect to discharge," and "further ... that he has been retaliated against, in violation of Section 704(a) of the Civil Rights Act of 1964, as amended, for complaining about activities protected under the Statute." Pl.'s Compl. at Attachment. The EEOC, by a letter dated September 20, 1994, notified the Plaintiff that it had determined that there was no support for his allegations with respect to discharge and retaliation. In particular, it found that other non-African-American employees had been discharged for lack of work, that the witnesses did not support the Plaintiff's allegations, and that the person who was allegedly hired to replace Brumback was actually hired as a heavy equipment mechanic and not as a small equipment me-

---

7. Brumback also testified that he spoke to Michael Callas outside his office regarding Hammond's comments to him. Pl.'s Brumback Dep. at 33–34. Michael Callas testified at his deposition that it had been brought to his attention that Hammond was making racial remarks to the Plaintiff, however, he did not remember how he had become aware of these comments. Pl.'s Callas Dep. at 40–41. In response, Callas stated that he brought Hammond into the office and advised him that he had "heard that he had made a remark—assumed that he had made the remark, and that the company absolutely did not tolerate any type of those kind of character remarks. And, if it persisted he would be discharged. Period." *Id.* at 40. Construing all ambiguities in the Plaintiff's favor, the Court assumes that Callas actually spoke with Hammond twice, both before and after he received notice of the MCHR/EEOC filings.

chanic. *Id.* Consequently, Brumback's complaint was dismissed, and he was advised that he may file suit within ninety days of receipt of the letter. He instituted the present action on December 20, 1994, ninety days after the date of the EEOC's letter.

Brumback alleges that as a result of the abusive working environment created by Hammond, he has suffered emotional distress. He claims that prior to Hammond's employment and subsequent abusive conduct towards him, he enjoyed hunting, fishing, and working on cars in his free time. Pl.'s Brumback Dep. at 58. Hammond's conduct, according to Brumback, has sapped the energy out of him. He claims that he no longer engages in these activities because he does not feel as if he has the mental ability to perform them. *Id.* Moreover, he maintains that he is unable to concentrate and that he is "so worried." *Id.*

Another Callas Contractors employee, George Lashley, confirms that the Plaintiff appeared to undergo change as a result of Hammond's conduct. Lashley claims that prior to when Hammond began working at Callas Contractors, Brumback had been a "nice guy" who always helped others. Pl.'s Lashley Dep. at 35. Over time, however, his attitude changed; he was constantly angry. *Id.* at 35, 64. Furthermore, he looked like he was drinking all the time, and was not sleeping. *Id.* at 64.

All other relevant facts will be set forth below as deemed necessary.[8]

### B. Count I—Title VII

The first count of the Plaintiff's complaint encompasses two separate theories of Title VII violations, abusive working environment based on race and discriminatory discharge. 42 U.S.C. 2000e–2(a)(1). Each theory has its own scheme of proof; thus, each will be dealt with separately.

#### 1. Abusive Working Environment[9]

The Supreme Court in *Meritor Svgs. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986), recognized that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *See also Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In order to be actionable under Title VII, however, the conduct cannot merely generate "offensive feelings in a employee." *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Rather, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive...." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. *See also Carter v. Ball,* 33 F.3d 450, 461 (4th Cir.1994). Moreover, the victim must "subjectively perceive the environment to be abusive...." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. Although there is no precise test for determining whether a work environment is sufficiently hostile to be actionable under Title VII, the Supreme Court in *Harris* outlined the following factors for consideration in making the determination:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

---

**8.** The Plaintiff also claims that during this period of time he became homeless and the Defendant built a room on its property for him to stay in. Pl.'s Brumback Dep. at 58–59; *see also* Pl.'s Hammond Dep. at 37. The Plaintiff suggests that when the Defendant subsequently told him to move, it was acting in retaliation for his complaints of harassment.

**9.** No mention of the charges setting forth an abusive working environment from the Plaintiff's earlier complaint was mentioned in the EEOC's right to sue letter attached to the Plaintiff's Com-

plaint. Moreover, this Court does not know if a right to sue letter was ever issued by the EEOC with respect to the Plaintiff's earlier charges. Although the Defendant affirmatively plead in its Answer that the Plaintiff's claims are time barred, whether or not the Defendant's hostile work environment claim should be barred pursuant to the time limitations set forth in 42 U.S.C. § 2000e–5 has not been argued by the Defendant on summary judgment. Thus, it is deemed waived for present purposes.

performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. *Id.* at ——, 114 S.Ct. at 371.

■■■■■ In order to survive a motion for summary judgment on an abusive environment claim, "the plaintiff must make a *prima facie* showing that [the] harassing actions took place...." *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983). *See also Dwyer v. Smith,* 867 F.2d 184, 187 (4th Cir.1989). *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court of Appeals for the Fourth Circuit described the requirements for a *prima facie* showing in *Paroline v. Unisys Corp.,* as follows:

[T]he plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on [race], (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer.

879 F.2d at 105. If the plaintiff successfully meets this initial burden, then the employer may still be successful on summary judgment if it is able to prove that "either ... the events did not take place, ... they were isolated or genuinely trivial[,] ... [the employer took prompt] remedial action reasonably calculated to end the harassment," or the employer was unaware of the harassment. *Katz,* 709 F.2d at 256. *See also Dwyer,* 867 F.2d at 187.

■■■ The Defendant contends that Brumback has failed to set forth a sufficient showing to establish a *prima facie* case because he has failed to demonstrate that the alleged conduct "created an abusive working environment for him at Callas." Df.'s Mem. in Supp. of Mot. for Summ.J. at 11. In particular, the Defendant argues that the events related by the Plaintiff were "isolated occurrences" perpetrated by one individual over a protracted period of time. *Id.* at 11–12. Moreover, the Defendant suggests that it is relevant that one of the comments was not even made to the Plaintiff directly, but, rather, he heard it by eavesdropping on a conversation between Hammond and Gary Moser. *Id.* at 12. In addition, because Hammond was viewed as giving "everybody a hard time about their work," *see* Df.'s Lashley Dep. at 43–44, the Defendant maintains that the Plaintiff has failed to demonstrate that the complaints about his work were due to his race. *Id.* at 13. Finally, the Defendant contends that some of Brumback's allegations are too vague to support his claims. *Id.*

The Defendant's arguments, for the most part, are best saved for the trier of fact at closing argument. This Court is unpersuaded by the Defendant's arguments, based on the record before it, that the Plaintiff has failed to establish the elements of a *prima facie* case. A trier of fact could certainly find that the instances cited by the Plaintiff do not constitute the sort of isolated or trivial instances which remain outside the purview of Title VII. Where one individual continues to verbally abuse an employee over the course of several months, this Court is at a loss to call these incidents "isolated." Nor is repeated use of the ancient epithet—"nigger"—trivial as a matter of law.

Furthermore, this Court is not persuaded that it should matter that one of the comments made was made to an individual other than the Plaintiff. In fact, a contrary inference is warranted. This instance, in particular, bears witness to tolerance by upper management at Callas Contractors of such behavior. In addition, the more people before whom Hammond demonstrated such conduct without any repercussions, the more reasonable it is that the working environment as a whole, as opposed to just his working relationship with Hammond, was abusive.

As for the Defendant's argument that, because Hammond was viewed as a difficult person to work for by his other employees as well, his comments and actions towards the Plaintiff were not on account of his race, is wholly without merit. Regardless of Hammond's conduct towards other employees, his decision to address the Plaintiff as a "nigger" changed the scope of his comments towards

Brumback as opposed to his conduct towards other employees. Title VII does not protect employees from all types of conduct which create an abusive working environment; it does, however, provide protection against discrimination on the basis of race. When Hammond chose to critique the Plaintiff's work or person, he patently interjected the Plaintiff's race into his comments. Any reasonable trier of fact could certainly determine that comments with a patently racial overtone were directed at the Plaintiff because of his race.

Finally, the Defendant argues that the Plaintiff's allegations are too vague to support a *prima facie* case. Although portions of the Plaintiff's story may be vague, overall he has articulated with sufficient specificity the details of the relevant events to set forth a *prima facie* case for purposes of summary judgment. Moreover, his story is buttressed by the depositions of his coworkers. In sum, a finder of fact could find that Hammond's conduct created an abusive work environment on the basis of race from the perspective of both the reasonable person and from the perspective of Brumback himself. *See Rodgers v. Western–Southern Life Ins. Co,* 12 F.3d 668, 675 (7th Cir.1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal citation omitted)).

▮▮▮ The only remaining question, therefore, is whether the Defendant should be held liable for the unlawful actions of one of its employees. "In a hostile environment claim such as we have here, an employer is liable for one employee's [racial] harassment of another worker if the employer had 'actual or constructive knowledge of the existence of a [racially] hostile working environment and took no prompt *and adequate* remedial action.'" *Paroline,* 879 F.2d at 106 (quoting *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (quoting *Katz,* 709 F.2d at 255) (emphasis added in the original)). "The adequacy of [the Defendant's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable

minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.'" *Paroline,* 879 F.2d at 106 (quoting *Katz,* 709 F.2d at 256). *See also Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1131–32 (4th Cir.1995). The Plaintiff has presented sufficient evidence that the Defendant was aware of the conduct prior to receiving a copy of the EEOC complaint, and that previous remedial efforts had not had any real effect. At different times John Moser, Gary Moser and Michael Callas each spoke with Hammond. No counseling or monitoring of Hammond's conduct was ordered. *See generally Paroline,* 879 F.2d at 106–07. Nothing was done to prevent future contact between Hammond and the Plaintiff as Hammond remained the Plaintiff's supervisor. In sum, a reasonable person could find that the Defendant's response was inadequate; therefore, summary judgment on the Plaintiff's abusive work environment claim would be inappropriate and shall be denied.

### 2. Racially Discriminatory Discharge

▮▮▮ The Plaintiff may prove that his discharge was motivated by race in either of two ways—(1) by direct or indirect evidence, or (2) by the judicially created proof scheme set forth in *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. *See Goldberg v. B. Green and Co., Inc.,* 836 F.2d 845, 847–48 (4th Cir.1988). Under the latter approach, a plaintiff may establish

[a] *prima facie* case of racially motivated discharge [by proving that] . . .: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job and performed the job satisfactorily; (3) in spite of plaintiff's qualifications and performance, plaintiff was . . . discharged; and (4) the position remained open to similarly qualified applicants after plaintiff's dismissal [or was filled by someone of comparable qualifications outside the plaintiff's class].

*Carter,* 33 F.3d at 458–59. *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir. 1989). The burden then shifts to the Defen-

dant to produce "an explanation to rebut the prima facie case—*i.e.,* the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's,* 509 U.S. at ——, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). *See also Carter,* 33 F.3d at 459. If the Defendant's proffered reasons·are facially legitimate and nondiscriminatory, the presumption of unlawful discrimination falls away. *St. Mary's,* 509 U.S. at ——–——, 113 S.Ct. at 2748–49. The burden then returns to the Plaintiff to produce "competent evidence that the presumptively valid reasons for [Brumback's termination] were in fact a coverup for a racially discriminatory decision." *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825. *See also Carter,* 33 F.3d at 459.

The Defendant contends generally that the Plaintiff has failed to produce sufficient admissible evidence·to establish a *prima facie* case. More specifically, Callas Contractors maintains that Brumback has failed to establish the fourth element of his *prima facie* case, *i.e.,* that his former position with the Defendant as a small equipment mechanic remained open or was filled after he was laid off. Df.'s Mem. in Supp. of Mot. for Summ.J. at 16.

There is no question that·Brumback is a member of a protected class, or for that matter, that he was ultimately laid-off. The only questions remaining, therefore, are whether the Plaintiff was adequately performing his job at the time he was laid off, and whether the position remained open or was filled after he was laid off.

■ With respect to the issue of the Plaintiff's qualifications and job performance at the time he was laid off, he has produced several satisfactory job performance evaluations covering 1986–1989, which were completed by the Defendant. Pl.'s Mem. in Opp. to Df.'s Mot. for Summ.J. at 15 & Ex. B. In addition, Michael Callas testified that prior to January 1993 the Plaintiff was performing his job "satisfactorily." Pl.'s Amend. Callas Dep. at 9. John Moser also testified that from 1987 through January 1993, that the

Plaintiff's job performance was "pretty good," that his attendance was good, and that he had usually been on time. Df.'s J. Moser Dep. at 7. Furthermore, the reason given for laying off the Plaintiff was not related to his job performance. As such, given such an extended period of ·satisfactory performance and attendance, and that all permissible inferences are to be resolved in favor of the non-moving party on summary judgment, this Court finds that the Plaintiff has met his burden of production with respect to the third element of his *prima facie* case.

■ As for the final element of the Plaintiff's *prima facie* case, the Defendant maintains that "[t]he position [of small equipment mechanic] was not filled following the Plaintiff's discharge. In fact, Callas [Contractors] no longer employs a small equipment mechanic." Df.'s Mem. in Supp. of Mot. for Summ.J. at 16. The Plaintiff, however, contends that a white male known as "Jerry" was hired by Callas Contractors subsequent to his lay-off. Furthermore, even though "Jerry" was not called a "small equipment mechanic" by the Defendant, that was in fact his job. ·*See* Pl.'s Brumback Dep. at 76. Brumback's contention is adequately supported by the deposition of a former coworker to withstand the motion for summary judgment on this point. ·Ronald Burger testified that a man named Jerry was hired "[s]hortly after [Brumback] left," and that he had observed him performing Brumback's former duties. Burger Dep. at 17–18. Burger also testified that he had not witnessed him having any additional duties. *Id.*

The Defendant seeks to refute this claim through the affidavit of its chief financial officer, Terry Armstrong. According to Armstrong, six other employees were also laid off due to lack of work during the months of July and August 1993. Armstrong Aff. ¶ 5. Armstrong also stated that between the months of January and August 1993, "the number of non-office employees employed by Callas [Contractors] declined steadily from 137 to 86. Nearly all of the decline was due to layoffs because of lack of work." *Id.* ¶ 6. The probative value of these statements, made by affidavit in the context of summary judgment, is limited. First, these statements

are at best very general, *i.e.,* no names, specific dates, or positions of the other allegedly laid off employees are given. Second, a lack of work in one aspect of the Defendant's business does not necessarily translate to a lack of work in the Defendant's other job classifications. Finally, Armstrong's vague statements have not been tested by cross-examination, and are somewhat suspect due to Michael Callas's response at his deposition to the following question:

> Q: Since July of 1993, have you done much in the way of hiring—bringing on new hires?
>
> A: Oh, yes ... [both c]arpenters and general employees.

Df.'s Amend. Callas Dep. at 58.

Nevertheless, John Moser also testified that Brumback was Callas Contractors' only small equipment mechanic, and that no one has filled that position since Brumback was laid off. Df.'s J. Moser Dep. at 29–30. The Defendant contends that since Brumback was laid off, any work which would have come under his job description has either been sent to the appropriate dealer for repairs or repaired by someone in another job classification, such as a heavy equipment mechanic, in the event of an emergency. Df.'s Callas Amend.Dep. at 58. *See also* Df.'s J. Moser Dep. at 29–30.

■ Determining the truth in the face of these contradictory accounts requires, *inter alia,* credibility determinations. As disposition of matters requiring an evaluation of credibility are generally deemed inappropriate on summary judgment, *see Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir.1986); *Davis v. Zahradnick,* 600 F.2d 458, 460 (4th Cir.1979) (per curiam), the Defendant's motion for summary judgment on the discriminatory discharge count shall also be denied.

## C. Count II—Retaliatory Discharge

■ The Defendant also contends that the Plaintiff's claim for retaliatory discharge should fail. In order to survive the Defendant's motion for summary judgment, Brumback must establish initially that the "(1) plaintiff engaged in protected activity, such as filing an EEO complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." *Carter,* 33 F.3d at 460. *See also Williams,* 871 F.2d at 457; *Dwyer,* 867 F.2d at 190–91.

■ There is no dispute that Brumback has successfully produced evidence of the first two elements necessary to establish a *prima facie* case of retaliatory discharge. Whether the Plaintiff has produced probative evidence of a "casual connection" between his EEOC complaint and his subsequent termination is in dispute. As conceded by the Defendant, however, it is sufficient for purposes of summary judgment for the Plaintiff to demonstrate the temporal proximity between the time when the Defendant first became aware of the Plaintiff's complaint with the EEOC, and the time when he was laid off, to prove the casual connection. *See, e.g., Carter,* 33 F.3d at 460 (5 months); *Williams,* 871 F.2d at 454, 457 (4 months). In the instant case, the Defendant claims that it became aware of the EEOC complaint as late as February 6, 1993. The Plaintiff was laid off on July 13, 1993. Given the five month time span between these two dates, the Plaintiff has made a sufficient showing to support an inference of a casual connection; [10] thus, fulfilling the Plaintiff's burden to demonstrate a *prima facie* case.

---

10. The Plaintiff also argues that he has presented sufficient evidence of a casual connection "because Allen Hammond and John Moser commented that the Plaintiff was 'a no good nigger' and they would 'find a way to get rid of him.'" Pl.'s Mem. in Opp. to Df.'s Mot. for Summ.J. at 17 (quoting Pl.'s Brumback Dep. at 90). Whether or not such a comment alone would be sufficient to establish the casual connection need not be decided at this time, for this statement would not constitute admissible evidence for purposes of summary judgment. Although (due to the Plaintiff's editing of his deposition transcript) it is difficult to decipher the portion of the Plaintiff's deposition transcript referred to above, it appears that this statement was made by Bill Calwell to the Plaintiff in reference to comments Calwell overheard by Hammond and John Moser. The Plaintiff has not provided this Court with any reason to consider this double hearsay statement. "Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact at trial...." *Miller,*

As with other Title VII claims, however, if the plaintiff successfully establishes a *prima facie* case, "[t]he employer may rebut plaintiff's *prima facie* case by articulating non-retaliatory reasons for its actions. The burden then shifts back to plaintiff to prove the pretextual nature of those reasons." *Carter*, 33 F.3d at 460 (internal citations omitted). At that point, the Plaintiff must demonstrate that his pursuit of a discrimination complaint against his employer with the MCHR and the EEOC was the " 'motivating part' " of the decision to lay him off. *See McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991). In other words, it is insufficient for the Plaintiff to demonstrate that his complaint merely played some part in the Defendant's decision to lay him off. *Id.; see also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365–66 (4th Cir.1985); *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 243–44 (4th Cir.1982).

The Defendant claims that its reason for laying off the Plaintiff was lack of work. Moreover, the Defendant notes that in the time period surrounding the Plaintiff's termination, six other employees, who had not filed EEOC charges, were also laid off for lack of work. John Moser testified that prior to terminating the Plaintiff due to lack of work, he had him doing work outside his job classification because there was no small mechanic work to be done. Df.'s J. Moser Dep. at 25 (stacking and painting lumber, making deliveries to job sites). Thus, having successfully proffered a legitimate, nondiscriminatory reason for laying-off the Plaintiff, the Defendant "has ... rebutted any legal presumption of discrimination...." *St. Mary's*, 509 U.S. at ——, 113 S.Ct. at 2748.

Brumback, nonetheless, can meet his burden of production with respect to the issue of pretext on the basis of the same evidence which he relied for his discriminatory discharge claim. That is, evidence that a white male filled his position shortly after he was laid off. As the Defendant maintains

that its reason for laying the Plaintiff off was not related to his job performance, if a white male was hired to fill his position soon after he was let go, an inference of pretext could be made by a trier of fact. *See St. Mary's*, at ——, 113 S.Ct. at 2749 (inference of intentional discrimination can be drawn from the elements of the *prima facie* case combined with proof that the reason offered in rebuttal by employer is not worthy of belief). Therefore, summary judgment shall also be denied with respect to the retaliatory discharge claim.

### D. Counts III & IV—State Law Claims

Finally, the Defendant moved for summary judgment with respect to the Plaintiff's state law claims—negligent hiring and retention (Count III), and intentional infliction of emotional distress (Count IV). The Defendant's principal argument for both claims presupposed that this Court would grant its motion for summary judgment on the Plaintiff's federal claims, thus eliminating the jurisdictional basis for retention of the state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). As this Court has held to the contrary, this point need not be considered further. With respect to Count IV—intentional infliction of emotional distress, however, the Defendant also argues that the distress the Plaintiff allegedly suffered was not sufficiently "severe" as a matter of law to warrant recovery. *See Harris v. Jones*, 281 Md. 560, 570, 380 A.2d 611, 616 (1977). In particular, the Defendant argues that without medical testimony, the Plaintiff's evidence is insufficient for a trier of fact to conclude that the Plaintiff has suffered a *"severely* disabling emotional response...." *Id.* (emphasis in the original).

In order to prove a cause of action for intentional infliction of emotional distress in Maryland,[11] the Plaintiff must demonstrate the following:

---

Wright & Kane, *Federal Practice and Procedure Civil.2d* § 2727, at 156. Furthermore, it is not clear from the transcript who is alleged to have actually made this statement, Hammond or Moser, as it is attributed to an ambiguous "they said."

11. The law governing the Plaintiff's state claims is that of the forum state, Maryland. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Id.* at 566, 380 A.2d at 614. Recovery under this theory of liability has been severely limited in Maryland. As explained by the Maryland Court of Appeals in *Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991), " '[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 61, 502 A.2d 1057, 1065, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)).

It is assumed for purposes of summary judgment only, that the Plaintiff has presented sufficient evidence of the Defendant's intent, and outrageousness.[12] Nonetheless, this Court holds that the Plaintiff is unable to set forth sufficient evidence to meet the fourth element of a cause of action for intentional infliction of emotional distress in Maryland—severity of injury. Before reaching the fourth element of the tort, however, the Court notes the potential evidentiary problems with the third element of the Plaintiff's case as well due to its interconnectedness with the insufficiency of his proof on severity of injury.

The third element of the tort requires that the Plaintiff demonstrate a casual connection between the Defendant's conduct and his alleged emotional distress. Lashley testified that the Plaintiff, who had previously been "a nice guy," became angry and "mad at everybody," that he no longer wanted any personal contact, and that "he was just a changed person." Pl.'s Lashley Dep. at 35. In addition, Lashley stated that Brumback looked like he was drinking all the time, and that he was not sleeping. *Id.* at 64. These changes in the Plaintiff's behavior, according to Lashley, began to occur "[w]hen Allen Hammond was about three months into the job. When he was hired." *Id.* at 35.

First, in the Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment, Brumback explained that "[d]uring the period beginning at the end of 1992 through the first part of 1993, the Plaintiff began to experience severe financial difficulties. As a result of these financial difficulties the Plaintiff found himself homeless." *Id.* at 3. This period of time mirrors the term of Hammond's employment.

Second, when asked at his deposition about his emotional condition, the Plaintiff stated that he was worried about his "life" and the fact that he "ain't got no job." Pl.'s Brumback Dep. at 86. In addition, he explained that this condition was a result of both being laid off and Hammond's conduct. *Id.* at 87.

Both the Plaintiff's homelessness and his joblessness represent two external forces which could be the actual reasons for the Plaintiff's distress; thus, the question of causal connection is in serious dispute. The

---

12. It should be noted that this Court also has doubts as to the sufficiency of the conduct alleged to constitute outrageousness for this tort. Racial epithets are no doubt harmful, and they are even more so when they are espoused by one's supervisor at work. *Cf. Rodgers v. Western–Southern Life Ins. Co,* 12 F.3d 668, 675 (7th Cir.1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal citation omitted)). Nonetheless, although certainly abhorrent, Hammond's conduct does not appear to rise to the high level of outrageousness that the Maryland Court of Appeals has required for a cause of

action based on intentional infliction of emotional distress. *See, e.g., Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991) (behavior of psychologist who, while acting as plaintiff's and his wife's marriage counselor, had sexual relations with the plaintiff's wife, was sufficiently outrageous); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (intentional exposure of plaintiff to transmission of herpes was outrageous); *Young v. Hartford Acc. & Indem.,* 303 Md. 182, 492 A.2d 1270 (1985) (insurer's insistence that plaintiff submit to a psychiatric examination calculated to harass the plaintiff and to either force her to abandon her claim or to commit suicide was deemed outrageous). As the Defendant does not argue this point in its Motion for Summary Judgment, it is deemed waived for present purposes.

existence of these external factors, and their possible effect on the Plaintiff's psyche, makes it difficult at best to ascertain which one, if any, of them may be responsible for causing the Plaintiff's alleged distress. Moreover, the Plaintiff has neither consulted a health care professional for treatment, nor has he presented this Court with any expert medical testimony confirming his condition. *Cf. Caldor, Inc. v. Bowden,* 330 Md. 632, 645, 625 A.2d 959, 965 (1993) (plaintiff sought psychiatric care on the eve of litigation and presented no expert medical testimony at trial; held that "his own description of his discomfort was insufficient to establish severe emotional distress").

With respect to the fourth element of the tort, the Maryland Court of Appeals recently considered similar factual claims as those of the Plaintiff in the context of a racial harassment/employment context. In *Caldor, Inc. v. Bowden,* the plaintiff explained that the defendant's conduct had left him

distraught and worried; he "was hurt a lot" and felt ashamed because his peers saw him being removed from Caldor in handcuffs. [the plaintiff] also testified that he tended not to socialize as much as before, kept to himself, and did not trust others very readily. He stated that he was able, however, to continue his normal activities.... [His] "sadness" and insecurity continued for more than a year and as a result he paid one visit to a psychologist in the winter of 1990. At trial [he] only introduced the psychologist's intake form and did not call the psychologist as a witness. In the intake form [the plaintiff] complained of weight loss over the past four months and reported that he felt "sad," "confused," and "bad about himself." The intake form did not contain any of the psychologist's conclusions; it only reported Bowden's own complaints.... [The plaintiff] presented no expert testimony about his emotional distress.

330 Md. at 642–43, 625 A.2d at 963–64. None of these complaints, however, demonstrated that the plaintiff in *Caldor, Inc. v. Bowden* was incapable of carrying out his daily activities. *Id.* at 644, 625 A.2d at 964.

*See also Moniodis v. Cook,* 64 Md.App. 1, 15–16, 494 A.2d 212, 219 (plaintiffs testified that as a result of the defendant's conduct, they had become upset, increased smoking, lost sleep, and broken out in hives; held insufficient to establish severe emotional distress), *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985).

In addition, the Maryland Court of Appeals' most recent opinion appears to require an elevated level of distress for claims of intentional infliction of emotional distress for claims based on racially discriminatory conduct. As described by Judge Eldridge in his dissent from the majority's opinion in *Caldor, Inc. v. Bowden:*

[T]he majority's requirement that, to recover for intentional infliction of emotional distress, one must have suffered a "disabling emotional response that hindered his ability to carry out his daily activities," will likely work against many members of groups which have, unfortunately and through no fault of their own, suffered more discrimination, harassment and abuse in our society than that suffered by the majority of individuals. Many members of certain minority and socio-economic groups, who have suffered discrimination and abuse, have developed a tougher hide than many other persons. Many of those who have more frequently been the victims of outrageous conduct have developed, from experience and necessity, the ability to continue functioning in their daily activities. While the emotional hurt may be as strong or stronger, the ability to function normally may be greater. Under the majority's formulation of the tort, however, those persons who are able to carry on with their principal daily activities will not be able to recover damages for their severe emotional distress resulting from extreme and outrageous intentional conduct. In its application, the tort will discriminate against those who have developed a degree of resiliency because of past discrimination.

330 Md. at 676, 625 A.2d at 980 (internal citation omitted).

In the instant case, the Plaintiff has expressed that he is no longer able to participate in his former leisure-time activities. Specifically, he points to the fact that he no longer likes to hunt, fish or work on cars. These sorts of activities are not the sort of daily activities which must be interfered with to render the distress disabling and severe. *See, e.g., Figueiredo–Torres v. Nickel,* 321 Md. 642, 656, 584 A.2d 69, 76 (1991) (plaintiff's distress was sufficiently severe where he required hospitalization). Although it may not be necessary (as a matter of law) that a plaintiff *always* produce medical testimony to make out a case of intentional infliction of emotional distress, in the present case, without more, the Plaintiff's case is legally insufficient to withstand summary judgment. This Court has no doubt that racially discriminatory conduct could cause a severely disabling injury which would fall within the boundaries of the elements of this tort in Maryland. Taken as a whole, however, the Plaintiff's proof is insufficient to establish such an injury. Thus, the Defendant's motion for summary judgment shall be granted with respect to Count IV of the Plaintiff's complaint—intentional infliction of emotional distress.

## IV. Conclusion

In sum, the Plaintiff's motion to strike the Defendant's motion for summary judgment shall be denied. The Defendant's motion for summary judgment shall also be denied as to all counts, except Count IV of the Plaintiff's Complaint—intentional infliction of emotional distress. It shall be so ordered.