**Mary Linda BISSELL, Plaintiff,**

**v.**

**Janet RENO, Gilbert Brown, and Douglas F. Cureton, Defendants.**

**No. Civ. AMD 97–1274.**

United States District Court, D. Maryland.

Nov. 16, 1999.

Christine Saverda Nielson, Towson, MD, for plaintiff.

Tamera Lynn Fine, Assistant U.S. Attorney, Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Mary Linda Bissell, a Caucasian woman who is dyslexic, worked from mid–1992 until her resignation in August 1995 as a Computer Operator/GS–6 at the Department of Justice ("DOJ") in the Justice Management Division's Computer Operations Department. She alleges claims under § 501 of the Rehabilitation Act of 1972, 29 U.S.C. § 791, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Specifically, Bissell alleges that from 1993 until she resigned, DOJ failed to accord her reasonable accommodation for her dyslexia disability in respect to the performance of her duties as a GS–6 Computer Operator, and thereby discriminatorily denied her a *promotion* to a level GS–7 Computer Operator. In the alternative, she alleges that DOJ failed to accord her reasonable accommodation in respect to her *opportunity for promotion* to a GS–7 position. In addition, she alleges that DOJ tolerated the actions of a fellow worker, an African–American, who targeted her for harassment because of her race and/or disability, and thereby created a hostile workplace environment. Finally, Bissell alleges that DOJ retaliated against her for filing a complaint with EEOC. Bissell seeks back pay, compensatory damages for pain and suffering and attorney's fees.[1]

Pending before the court are DOJ's Motion to Dismiss and/or Motion for Summary Judgment on all counts of the complaint, as well as Bissell's Cross Motion for Summary Judgment. A hearing was held on November 12, 1999. I have considered the parties' arguments, memoranda and exhibits. For the reasons stated below, I shall dismiss the complaint as against the individual defendant supervisors and I shall grant summary judgment to DOJ on all counts. Bissell's cross motion shall be denied.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse par-

---

1. Read liberally, Bissell's complaint also alleges that she was constructively discharged when she resigned from her position in Computer Operations in August 1995. *Complaint* ¶ 64. At the hearing on the pending motions, however, Bissell conceded that she is not seeking relief on any theory in respect to her resignation. (After a period during which she was unemployed, DOJ rehired Bissell and she began working for DOJ's Justice Management Division on the Computer Services Staff as a secretary.)

ty's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered· in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F.Supp. 170, 172 (D.Md. 1985) (quoting Charles A. Wright, Arthur R. Miller & Mary Kay 10A Kane, *Federal Practice and Procedure: Civil* 2d § 2720). *See also Federal Sav. & Loan Ins. Corp. v. Heidrick,* 774 F.Supp. 352, 356 (D.Md. 1991). "[C]ross-motions for summary

judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must· evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir.1967). *See also McKenzie v. Sawyer,* 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook,* 713 F.2d at 665.

(ii)

I shall accept Bissell's account of the facts as true wherever her version of events differs from that relied on by DOJ. While I provide a more complete recounting as I analyze each of Bissell's claims, I summarize the factual context here.

Bissell transferred from a secretarial job in DOJ's Justice Management Division, *Bissell I*[2] at 21, and began working in

---

**2.** Deposition transcripts, attached as exhibits to the parties' memoranda, are referred to in this opinion in the following manner:
*Bissell I:* Deposition of Mary Linda Bissell, March 21 & 22, May 1 & 9, 1996 (Exhibit 1

to Bissell's Memo. in Supp. of Pl.'s Amen. Opp. to Defs.' Mot. To Dismiss and/or for Summ.Judg. and Cross–Mot. For Summ. Judg. ("Bissell's Response")).

Computer Operations in "approximately 1992." *Id.* at 159–60. Computer Operations consisted of four areas, located in separate adjoining rooms: Micrographics, Printing, Console and Tape. *Cureton I* at 19; *Brown* at 21–26. Computer operators would rotate through each of these four areas, spending generally a week in the Console Area every eight or nine weeks, and somewhat longer periods in each of the other areas. *Cureton* at 66–67; *Bissell II* at 129; *Brown* at 32–33, 37.

The Console Area was the "brain" of Computer Operations. *Brown* at 26. It was a room with 15 computer monitors, upon which would appear codes indicating problems that operators needed to fix, or commands that operators needed to carry out. *Id.* at 25–27. Generally, the Shift Supervisor for all of Computer Operations, an Assistant Shift Supervisor and one or two Computer Operators would be assigned to the Console Area at any one time. *Brown* at 28; *Lewis* at 12–13. The Shift Supervisors were responsible for the entire staff of Computer Operations, *Lewis* at 12–13, so one or the other or both were sometimes called into the other areas to assist employees. *Bissell I* at 83. In addition to the task of responding to the messages displayed on the computer monitors, the duties of the operator assigned to the Console Area included reception for all incoming phone calls to Computer Operations. *Bissell I* at 623–24.

Bissell began working on the night shift and then transferred some nine months later, "in early to mid–1993," to the day shift. *Bissell I* at 159–60. In April or May 1993, she had her first evaluation meeting with her supervisors. *Cureton I* at 83. They informed her that she was performing successfully in all six categories of evaluation, but that her skills on the console needed improvement. *Cureton I* at 88–90. For the first time in this meeting, Bissell requested extra training on the console as an accommodation of her disability of dyslexia. *Cureton I* at 83.[3]

At about this time, her supervisors informed Bissell that she would not be "promoted" from a grade GS–6 to a grade GS–7 Computer Operator. *Cureton I* at 90. Under the relevant work rules, supervisors were free to "promote" computer operators from a grade GS–6 to a grade GS–7 whenever they concluded that an operator's skills and abilities justified such a "promotion." Upon "promotion," an operator's duties remained the same; however, the "promotion" to grade GS–7 provided at least two important benefits: (1) an increase in pay, and (2) eligibility for further promotions to supervisory positions at GS–8 and above.

Soon after the evaluation meeting, DOJ management requested that Bissell be tested to verify her disability. *Cureton I* at 45, 48, 51; *Brown* at 113. Bissell con-

---

*Bissell II:* Deposition of Mary Linda Bissell, January 8, 1998 (Exhibit 2 to Bissell's Response).

*Cureton I:* Deposition of Douglas Fairbanks Cureton, December 22, 1997 (Exhibit 3 to Bissell's Response).

*Cureton II:* Deposition of Douglas Fairbanks Cureton, December 22, 1997 (Exhibit 1 to DOJ's Reply to Pl.'s Amend.Res. to Defs.' Mot. for Summ.J. and Res.Opp. Pl.'s Cross–Mot. for Summ.J. ("DOJ's Reply")).

*Brown:* Deposition of Gilbert Joel Brown, January 20, 1998 (Exhibit 4 to Bissell's Response).

*Lewis:* Deposition of Michael Lewis, August 27, 1998 (Exhibit 5 to Bissell's Response).

*Mathis I:* Deposition of Floria Mathis, August 27, 1998 (Exhibit 6 to Bissell's Response).

*Mathis II:* Deposition of Floria Mathis, August 27, 1998 (Exhibit 14 to DOJ's Reply).

*Bucks:* Deposition of Betsy Bucks, November 20, 1998 (Exhibit 7 to Bissell's Response).

*Conway:* Deposition of Paul Edward Conway, December 30, 1997 (Exhibit 10 to Bissell's Response).

*Britton:* Deposition of George H. Britton, Jr., December 30, 1997 (Exhibit 13 to Bissell's Response).

3. While Bissell had apparently been asking for extra training time on the console since beginning working in Computer Operations, *Cureton I* at 65, there is no dispute in the record that Bissell requested extra console time specifically as an accommodation to her dyslexia for the first time in April/May 1993. *Id.* at 83.

tacted the Maryland Division of Vocational Rehabilitation and was tested.[4] *Bissell II* at 181. Bissell presented the results of this testing to DOJ management in March 1994. *Cureton I* at 147–48; *Brown* at 141–45. The test results confirmed that Bissell was dyslexic. *Brown* at 144; *Bissell I* at 447; *Mathis I* at 29.

In about April 1993, a co-employee, referred to by the parties as "Employee No. 1," was assigned to light duty for an extended period of six months in order to accommodate her recovery from carpal tunnel syndrome, which prevented her from performing her normal duties. *Bissell I* at 623–24. Like most other employees and supervisors at DOJ, *Lewis* at 111, Bissell found it difficult to work with Employee No. 1. Indeed, an employee/acquaintance outside of Computer Operations had warned Bissell before she transferred to Computer Operations to stay away from Employee No. 1. *Bissell I* at 49. Bissell generally avoided her until Employee No. 1 was assigned to light duty in the Console Area. *Id.* at 49.

On April 22, 1993, *DOJ Ex.* 9, Bissell and Employee No. 1 were both assigned to the Console Area. *Bissell I* at 54. They had an argument in which Employee No. 1 made a remark to Bissell in front of their supervisor, Gilbert Brown, which Bissell interpreted as a physical threat. *Bissell I* at 54–61. The following week, on April 28, 1993, Bissell and Employee No. 1 had another altercation in which Employee No. 1 told Bissell she was the "dumbest white woman" she had ever known. *Bissell I* at 102–05. Again, this remark was made in front of Brown. *Id.* Bissell contacted the EEOC later that day. Complaint ¶ 67.

On May 18, 1993, DOJ issued a letter to Employee No. 1 giving her notice that DOJ was proposing to suspend her for fourteen days because of the incidents with Bissell on April 22 and 28, 1993. DOJ Ex. 9. On June 30, 1993, DOJ issued its decision suspending Employee No. 1 for seven days. DOJ Ex. 10. Bissell was unaware of the discipline invoked against Employee No. 1, *Bissell I* at 106, but did notice DOJ's efforts to keep them separate, though this was not always possible given the geography of Computer Operations. *Bissell I* at 47–48. Employee No. 1 continued to disturb Bissell by bumping into her chair when walking past her, *Bissell I* at 599, and by refusing to socialize with her. *Id.* at 84. Employee No. 1 retired in October 1994. Complaint ¶ 57.

In the meantime, in response to Bissell's request in April or May 1993 for additional training to accommodate her dyslexia, DOJ supervisors dialogued with Bissell and her advocates.[5] Ultimately, they provided an assortment of types of training

---

**4.** Bissell previously had been tested at Maryland Department of Vocational Rehabilitation at some point several years prior to her employment at DOJ as a secretary. *Bissell I* at 441. The 1993 testing was the first time she was tested during her DOJ employment.

**5.** DOJ union representatives Floria Mathis and Dorothy Mulhall Balesh and DOJ Employee Assistance Program representative Heather Kocher were in contact with Bissell concerning her difficulties with the Computer Operator job, the harassment she experienced from Employee No. 1, and Bissell's continuing attempts to obtain specialized training. While the record is not clear about when these representatives became involved with aiding Bissell, they were all clearly in the picture by April 1993. *See infra* at 531, *et seq.* Beginning in May 1994, *Bissell I* at 440–41, they were present with and represented Bis-

sell at various meetings with DOJ management concerning her disability and her training needs. *See infra* n. 14.

Furthermore, when Bissell went for testing at the Maryland Department of Vocational Rehabilitation in the Winter of 1993, Betsy Bucks became Bissell's counselor there and she attended meetings with Bissell and DOJ management beginning in August 1994. *Bissell I* at 449–54; *Bucks* at 28, 32. Also present at one or more meetings was Daryl Thorne, *Bissell I* at 471, who was Bissell's job counselor at Life Experiences Activities Program of Greater Washington, Inc. ("LEAP"), an advocacy organization. Bissell's Response Ex. 11. Apparently, the Maryland Department of Vocational Rehabilitation contracted with LEAP to provide Bissell with a job counselor beginning at about this time. *Bucks* at 32.

for the duration of her employment. Bissell's immediate supervisors were instructed to spend time training Bissell "whenever possible" within the confines of their other duties, *Lewis* at 45–47; 81–82; *Brown* at 127; *Conway* at 22, and they spent considerable time training her in a variety of modalities. *See infra* at 530. However, Bissell's repeated specific request to be assigned to the Console Area for extended periods of time was never granted.

Bissell filed a formal EEO charge on January 10, 1994, alleging DOJ's failure to accommodate her dyslexia disability and hostile environment race discrimination. *Complaint* ¶ 68. Bissell resigned from her position in August 1995. *Id.* ¶ 64. In July 1996, Bissell was hired to work as a secretary in DOJ's Justice Management Division in the Computer Services Staff of Business Services. *Id.* ¶ 65.

### (iii)

■ The procedural framework of Title VII suits governs civil suits, like this one, brought by federal employees pursuant to Section 501 of the Rehabilitation Act of 1973. 42 U.S.C. § 12117(a).[6] Under Title VII, the only proper defendant is "the head of the department, agency or unit," and individual supervisors are not proper defendants. 42 U.S.C. § 2000e–16(c); *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177 (4th Cir.1998); *Simmons v. Shalala*, 946 F.Supp. 415, 418 (D.Md.1996), *aff'd*, 112 F.3d 510 (4th Cir.1997). Janet Reno, as the Attorney General of the United States, is the head of DOJ. Accordingly, all counts against Gilbert Brown and Douglas F. Cureton, Bissell's supervisors at DOJ, are dismissed because they are not proper parties.

---

**6.** Likewise, Bissell's claim alleging hostile environment race discrimination in violation of Title VII is governed by Title VII's procedural framework.

**7.** The difference in wording between the ADA, "discrimination because of disability" and the

### (iv)

Reading her complaint liberally, as elaborated at the hearing, Bissell alleges that because of her disability, in the alternative, she has suffered three adverse job actions: (1) she was prevented from performing her duties as a Computer Operator at the GS–6 grade; (2) she was prevented from *excelling* in the performance of her duties as a Computer Operator at the GS–6 grade and thereby was denied a promotion to GS–7; and/or (3) she was *denied an opportunity for promotion* from GS–6 to GS–7 Computer Operator. She alleges each of these adverse actions violated section 501 of the Rehabilitation Act of 1973. 29 U.S.C. §§ 791, 794. Careful examination of the record in light of the controlling legal principles discloses that no reasonable juror could return a verdict in favor of Bissell on any of her theories.

Under the Rehabilitation Act "no qualified individual with a disability … shall, solely by reason of her or his disability … be subjected to discrimination under any … program or activity conducted by any Executive agency."[7] 29 U.S.C. § 794(a). The Act specifies that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under … [the ADA]." 29 U.S.C. § 794(d); *see Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995). Under the ADA, a qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See* 29 C.F.R. § 1630.2(m).

■ It is undisputed that Bissell is an "individual with a disability." For the pur-

---

Rehabilitation Act, "solely by reason of her or his disability … be subjected to discrimination," is immaterial to the claims at issue here. *See Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 732 n. 5 (D.Md.1996).

poses of DOJ's motion, it is also undisputed that she "can perform the essential functions" of the GS–6 Computer Operator position. DOJ's Mem. in Supp. of Mot.Dis. and/or for Summ.J. ("DOJ's Motion") at 14; DOJ's Mem. in Reply Pl.'s Amend. Resp. Defs.' Mot. for Summ.J. and Res.Oppos. Pl.'s Cross–Mot. for Summ.J. ("DOJ's Reply") at 6, n. 2. Bissell claims that DOJ discriminated against her in this position because of her disability by denying her the requested extended hands-on training in the Console Area. However, because she has failed to present a factual dispute about whether she needed such training as a reasonable accommodation to perform the GS–6 job, I shall grant summary judgment to DOJ on this theory.

Bissell alleges, but presents no evidence to support the allegation, that DOJ's failure to provide her hands-on training on the console for periods longer than one week every eight or nine weeks "caused her employment as a[C]omputer [O]perator to terminate." Complaint ¶ 83. She alleges that she "needed more hands on training on the console [as] a reasonable accommodation[ ] in order to perform her job." Id. ¶ 51. However, all of the evidence in the record indicates that Bissell was "fully successful" on all six categories of her performance evaluation in the GS–6 Computer Operator position, Cureton I at 89–90, and that she was entirely capable of carrying out its functions, essential and otherwise, without the requested accommodation of extended assignment to the console.

Bissell makes much of the fact that she was qualified to work the console by herself when the Senior Operator and the Shift Supervisor were called to other areas. Bissell's Mem. in Supp. of Pl.'s Amen.Opp. to Defs.' Mot. to Dis. and/or for Summ.J. and Cross–Mot. for Summ.J. ("Bissell's Response") at 10 (citing Cureton I at 107–08; Lewis at 27, 28, 31). Indeed, as noted earlier, DOJ has conceded that Bissell was qualified for the purposes of this issue. Thus, there is no genuine factual dispute on this issue. As a result, Bissell has failed to establish an essential element of the prima facie case of discrimination based on failure to accommodate: that "an accommodation was needed" in order to carry out the essential functions of the position. Gaines v. Runyon, 107 F.3d 1171, 1175 (6th Cir.1997). Because she has not established a prima facie case, "it is unnecessary to address the question of reasonable accommodation." Id.; see Williams v. Channel Master Satellite Systems, Inc. 101 F.3d 346 (4th Cir.1996), cert. denied sub nom Williams v. Avnet, Inc., 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997).

 Bissell next claims that DOJ unlawfully discriminated against her when it refused to allow her to excel in the performance of her duties as a GS–6 operator, and as cause therefor, refused to promote her to a GS–7 Computer Operator position or, in what she treats as an equivalent claim, she attempts to argue that she was denied the promotion because DOJ refused to assign her to the console for extended periods as a reasonable accommodation for her disability in her efforts to attain the GS–7 position. Summary judgment shall be granted to DOJ on this claim, however, because Bissell fails to project evidence of an essential element of her failure-to-promote claim, namely, that she was qualified, "with or without reasonable accommodation, [to] ... perform the essential functions of the employment position that [she] .... desires." 42 U.S.C. § 12111(8); 45 C.F.R § 84.3(k) (Under the Rehabilitation Act "'Qualified handicapped person'" means: ... With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question); see School Bd. of Nassau County, Florida v. Arline, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In brief, a candidate's **present** qualification for promotion is dispositive; an employer is not required to determine what "future abilities to perform the essential functions of

[the] position" the employee might develop. *Myers*, 50 F.3d at 283.

There is no dispute in the record that Bissell never qualified for a promotion to grade GS–7 Computer Operator. She does not allege that, at the relevant time, her console skills were currently sufficient for that grade. To the contrary, Bissell sought to *improve* her console skills so that she would *become qualified* for promotion.[8] Bissell's Response at 30–31. Most notably, Bissell submits an expert affidavit from Dr. Richard Ruth, a psychologist, offering the opinion to a "reasonable degree of psychological certainty" that during the relevant time period[9] Bissell "was fully capable of performing as a GS–7 computer operator with properly configured and reasonable training and reasonable accommodations." Bissell's Reply to Defs.' Resp.Opp. Pl.'s Cross–Mot. for Summ.J. ("Bissell's Reply") Ex. B at 2. This opinion can only be read to support the conclusion that Bissell *needed training* in order to learn to do the console aspect of her job well enough to perform at the GS–7 level. Thus her failure-to-promote claim fails because she does not provide evidence sufficient to support the conclusion that she was qualified for the desired GS–7 position. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (prima facie case of employment discrimination requires that plaintiff "was qualified for a job for which the employer was seeking applications"); *Tingley v. Henson Aviation*, 789 F.2d 275, 276–77 (4th Cir.1986) (failure to promote not discriminatory when plaintiff was unqualified for duties of new position).

Furthermore, Bissell's failure to promote claim fails for a second, independent reason: she cannot project evidence that "but for" DOJ's refusal to provide the requested training, she would have been promoted to GS–7. Even if one were to assume that Bissell's skills on the console would improve to GS–7 level were she given more extended periods working the console (not at all certain), promotion would not be automatic. Employers consider a host of other factors when considering employee advancement, including the relationships that employee has with co-workers and supervisors. *See, e.g., Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 30–32 (1st Cir.1990) (poor relationships

8. One could argue that any reasonable accommodation permits a disabled employee to "become" able to perform a job he or she was unable, and thus "unqualified," to perform without the accommodation. For example, being provided a computer that vocalizes and a reader might enable a sight-impaired attorney to perform a job she would be unable to perform without these accommodations. Likewise, Bissell could argue that extended training on the console would remove a disability-imposed-barrier to her performing the GS–7 Computer Operator position, i.e., her inability to learn without concentrated extended repetitive training opportunities. However, there is a qualitative difference between accommodations which allow an employee with the skills and knowledge to perform a job to do it, and accommodations which would allow an employee to learn how to perform a job in the future. The latter situation should be analyzed to determine whether the disabled employee was accorded "adequate opportunities for advancement." *See infra* at 530, *et seq.; see also Myers*, 50 F.3d at 282–83 (While the *Arline* framework for determining whether a handicapped individual is "qualified" requires a court to determine whether a person unable to perform a job could do it with reasonable accommodation, the inquiry is limited to the person's present and not "future ability to perform the essential functions of [the] position.").

9. Dr. Ruth also offers the opinion that Bissell is *currently* able to perform the job of GS–7 Computer Operator. Bissell's Reply, Ex. B at 2. However, Bissell's qualifications at the time that she alleges she was denied the promotion, (i.e., during her employment as a Computer Operator from 1992 until 1995), form the relevant evidence as to this claim. Moreover, the assertion that Bissell has now somehow, in 1999, become proficient enough at the console to perform at the GS–7 level, despite not having received the hands-on console training she claims she needed as an accommodation (and indeed, not having worked as a Computer Operator at all since August 1995), is patently incredible and undermines her other Rehabilitation Act claims asserted here and the probity of Dr. Ruth's expert opinion testimony as a whole.

**530**

with supervisors was legitimate nondiscriminatory justification for denying promotion). Bissell's own LEAP job coach notes in her reports that both of these are areas for improvement for Bissell. Bissell's Response, Ex. 14.

■ Finally, I shall consider Bissell's *promotional opportunity* claim. Pursuant to § 501, federal employers are required to provide people with disabilities with "adequate . . . advancement opportunities." 29 U.S.C. § 791(b). Violations of this duty are enforceable through a private right of action. 29 U.S.C. § 794(a); *Gaines,* 107 F.3d at 1175; *Redd v. Rubin,* 34 F.Supp.2d 1 (D.D.C.1998). *See also Little v. FBI,* 1 F.3d 255, 257 (4th Cir. 1993) ("Section 501 imposes an affirmative duty on federal agencies toward handicapped applicants and employees. 29 U.S.C. § 791(b)."). Based upon the undisputed facts in the record, I am persuaded that DOJ provided adequate opportunities for advancement to Bissell, i.e., that as a matter of law, DOJ reasonably accommodated Bissell in her endeavor to enhance her skills so that she could achieve the promotion to GS–7 she desired, and therefore I shall grant summary judgment to DOJ on this claim.

Viewing the facts in the light most favorable to Bissell, it is undisputed that Bissell was given numerous training opportunities to increase her proficiency on the console, some of which she utilized and some of which she did not utilize. For example, supervisors were assigned to provide her with training whenever possible. *Bissell I* at 201, 206, 208–13; *Cureton I* at 110; *Lewis* at 45–47, 81–82; *Brown* at 127; *Conway* at 22. While this training with supervisors sometimes included other employees (and was often interrupted by the demands of the workplace), supervisors spent significant time training Bissell.

*Bissell I* at 210–14, 217, 229, 231. Supervisors often spent thirty minutes to an hour or two, at least a couple of times per week, training Bissell. *Bissell I* at 208 (training with Supervisor Lewis "not . . . uncommon practice"); at 231 (training with Supervisor Britton a "couple of times a week"); *Conway* at 59, 63 (training for Bissell generally conducted in two hour sessions on a daily basis, for one week and thereafter "less than every single day").[10]

During one week, Supervisor Lewis spent "a few hours a day" reading aloud the console computer manual to Bissell. Bissell's Response at 14 (*citing Lewis* at 76–77). Moreover, while during most periods only one supervisor worked with Bissell, Conway and Britton worked with Bissell during overlapping periods. *Britton* at 50.

These supervisor sessions were spent in various ways: answering Bissell's questions, *Bissell I* at 208; reading aloud the computer manual to her, *Lewis* at 75; having her view training videotapes, quizzing her and answering her questions afterwards, *Bissell I* at 229; *Britton* at 44–46; working through a computer guided training program, *Bissell I* at 177–81; and providing her with visual aids when Heather Kocher of the DOJ's Employee Assistance Program requested them, *Bissell I* at 444, 447–48. When Supervisor Conway worked with Bissell, he would lecture concerning an aspect of console operations, and he would review with her what the manual said about that aspect. Then, he would often take her to the console to perform the process he had just taught. *Conway* at 61–63. Afterwards, they would return to the conference room to discuss what they had done on the console. *Id.*

Bissell was also given extra time on the console when employees assigned there were out sick. *Cureton I* at 165. She also

---

10. Bissell's Response states that Conway's sessions were provided to Bissell in "one-half (½) to one (1) hour" increments. However, the deposition transcript pages cited in support of this assertion do not support this claim. Thus, I assume as true, because uncontroverted, Supervisor Conway's deposition testimony that his training sessions were two hours long.

had occasional extra time on the console with her supervisor/trainer even when all assigned employees were present. *Conway* at 61–62. During her shifts on the console, the supervisor/trainer was available to answer her questions and there is no suggestion in the record that supervisors were ever unwilling to answer her questions, though she had more questions than the other employees assigned to work there. *Cureton I* at 139. Bissell acknowledges that some of this training was "beneficial," especially the year and a half with Supervisor Lewis as her trainer.[11] *Bissell II* at 269; *Mathis I* at 31.

In addition to these numerous and multi-faceted supervisor training opportunities, DOJ management allowed Bissell to ask her co-workers for their notes about the console because she found it difficult to work the console and take notes at the same time. *Bissell II* at 168–69. More-over, DOJ purchased a tape recorder for her so that she could record notes in classes. *Mathis I* at 30. Bissell was also allowed to leave work early to attend classes at Montgomery College. *Bissell I* at 439. As well, she was offered the opportunity to go to the Console Area whenever she had completed her tasks in the Micrographics Area, which was an assignment in which operators were often under-utilized. *Cureton I* at 68; *Brown* at 70–71.[12] Bissell was also offered the opportunity to work the night or evening shifts when the Console Area pace was slower and more conducive to hands-on training.[13] *Mathis II* at 26; *see Bissell I* at 86. In addition, DOJ management met on several occasions with Bissell and her advocates to discuss her training needs.[14]

The gravamen of Bissell's promotional opportunity claim is her criticism of DOJ's

---

**11.** Lewis conducted one-on-one training of Bissell "whenever possible" from April or May 1993 until November 1994, when he was transferred to the night shift. *Lewis* at 45–47, 81–85; *Brown* at 127.

**12.** Bissell's Response acknowledges that she was told she could go to the console when her other assignment permitted, but she discounted this opportunity because the assignments in the Printing and Tape Areas generally kept an operator so busy she could not go to the console. Bissell's Response at 10 (citing *Brown* at 70–71). However, she nowhere disputes that the assignment in the Micrographics Area would allow her extended periods to observe the console. *Brown* at 70–71; *Cureton I* at 68–69.

**13.** Bissell's neuropsychological evaluation specifies that she should not work the night shift because sleep deprivation would exacerbate her learning disability. DOJ Ex. 13 (Letter from Elaine Snyder, Rehabilitation Specialist, Maryland Department of Education, April 29, 1994). But that would not preclude her from working the *evening shift*. The fact that she wished to be home in the evening to spend time with her son is laudable and completely understandable, *Bissell I* at 86, but her conflicting child care needs do not constitute a "handicap" within the contemplation of the Rehabilitation Act, and did not create a duty on the part of DOJ to assign her to extended periods on the console during the *day shift*, to better enable her to increase her chances for promotion to grade GS–7.

**14.** These occasions included a meeting in April or May 1993 between Gilbert Brown, Doug Cureton and Bissell. *Cureton I* at 59–60. There was also a meeting in March 1994 to learn of the results of Bissell's evaluative testing attended by DOJ management representatives Gilbert Brown, Douglas Cureton, and perhaps Bissell's immediate supervisor, Michael Lewis, as well as DOJ Employee Assistance Program representative Heather Kocher, and DOJ union representative Floria Mathis. *Bissell II* at 471; *Cureton I* at 157. Another meeting was held on May 4, 1994, between DOJ management representatives Joe Reed, Cureton, Brown and Lewis, as well as DOJ union representative Dorothy Mulhull Balesh, Mathis and Kocher. *Bissell I* at 440–48. Another meeting was held in August 1994 between Cureton, Brown, Lewis, Price, and Bissell, Balesh, Kocher, and Maryland Department of Vocational Rehabilitation representative, Betsy Bucks, and Daryl Thorne, Bissell's job counselor from LEAP. *Bissell I* at 449–50. Thorne also subsequently met, at the job site on one occasion, with Bissell and Conway, her immediate DOJ supervisor. *Conway* at 75, 82; Bissell's Response, Ex. 14. Thorne apparently met with Michael Lewis and Bissell on five occasions during the period when Lewis was Bissell's trainer. Bissell's Response, Ex. 12 (Letter from Betsy Bucks to Doug Cureton, Aug. 10, 1995).

refusal of her repeated requests to assign her to work in the Console Area for periods of longer than one week every eight or nine weeks. DOJ supervisors in charge of scheduling felt that offering such a "plum[ ]" assignment, *Mathis II* at 52; *see Lewis* at 69, to Bissell would cause unnecessary dissension among the staff. *Brown* at 230; *Bissell I* at 213; *see Cureton I* at 136. As a matter of law, DOJ was not wrong to consider and weigh the feelings of the majority of its other Computer Operators, who also wanted more time on the console because it was the most interesting assignment among their rotations, and because it offered the opportunity to develop skills for advancement.[15] While adequate opportunities for advancement must be accorded to employees with disabilities, the "Rehabilitation Act has never been interpreted to mandate preferential treatment of an employee simply because [s]he is handicapped." *Gaines*, 107 F.3d at 1178 (*citing Fedro v. Reno*, 21 F.3d 1391, 1395 (7th Cir.1994)).

The undisputed fact that three other employees were given "light duty" extended.assignments on the console as a reasonable accommodation when they could not perform their normal assignments does not bolster Bissell's claim.[16] Bissell does not claim that she is or was unable to perform the duties of her GS–6 Computer Operator position. The one employee assigned to extended periods on the console in order to further his skills there did so on the night shift. Bissell's Response, Ex. 12. At one point, DOJ extended a similar training opportunity to Bissell, but she declined to take advantage of it. *Mathis II* at 26; *Bissell I* at 86.

Thus, it is undisputed that DOJ made a host of training opportunities available to Bissell to develop skills for advancement as a Computer Operator. As catalogued above, these opportunities were "adequate" as a matter of law under the Rehabilitation Act. Accordingly, I shall grant summary judgment to DOJ as to Bissell's claim that it discriminatorily denied Bissell "adequate advancement opportunities."

(v)

I turn now to Bissell's hostile environment claim. For the reasons explained herein, taking Bissell's version of the facts as true, even if the interactions Bissell had with her alleged harasser were severe enough or pervasive enough to constitute hostile environment harassment, as to which a close question is presented, a reasonable juror would be compelled to conclude on the available evidence that DOJ took prompt and effective disciplinary action against that harasser. Accordingly, I shall grant summary judgment to DOJ on Bissell's race harassment claim.

■ Bissell alleges that a Senior Computer Operator, Employee No. 1, a co-worker who sometimes exercised a degree of supervisory authority over her, but who was not her supervisor, harassed her because she was white and Employee No. 1 was black.[17] As a Senior Computer Operator, Employee No. 1 would only exercise

---

15. This is not an undue hardship analysis. Clearly, employee morale is not an adequate basis for refusing a reasonable accommodation to a disabled employee qualified to perform the essential functions of a position. 29 C.F.R. § 1630.15(d) appendix.

16. In one instance, the employee was recovering from back surgery, *Brown* at 191–93; *Cureton II* at 211–13; another during recuperation from carpal tunnel syndrome, *Bissell I* at 624; and a third during a psychologically disabling period of on-the-job stress. *Cureton II* at 209.

17. Bissell's claim that she was denied a reasonable accommodation for her disability because of her race is dismissed because she was not denied a reasonable accommodation. *See supra* at 528. Bissell also alleges that she was denied a promotion from GS–6 Computer Operator to GS–7 Computer Operator because of her race. However, she admits that she did not possess the console skills required by the GS–7 position, and was therefore unqualified for the promotion. *See supra* at 528. Moreover, Bissell offers no evidence to support this claim of race discrimination. It is accordingly dismissed with prejudice.

supervisory authority over other employees when she was assigned to the Console Area and when both the Shift Supervisor and the Assistant Shift Supervisor had been called away to deal with problems in one of the other three areas. *Bissell I* at 83. Even then, however, these supervisors were not far away. *Id.* at 46. This degree of supervisory authority is not sufficient, as a matter of law, to invoke strict employer liability for harassment committed by a supervisor. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Accordingly, I analyze Bissell's harassment claim under the standard for employer liability for coworker harassment.

██ As with claims for sexual harassment,[18] when an employer knows about racial harassment between coemployees it will be found liable for it unless it can show that it took "prompt and adequate remedial action." *Paroline v. Unisys Corp.,* 879 F.2d 100, 106 (4th Cir.1989) (internal quotation omitted), *vacated in part and rev'd in part on other grounds per curiam,* 900 F.2d 27 (4th Cir.1990) (*en banc*). The remedial actions should be "reasonably calculated to end the harassment." *Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991); *Brumback v. Callas Contractors, Inc.,* 913 F.Supp. 929, 939 (D.Md. 1995). "The adequacy of [the defendant's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.'" *Paroline,* 879 F.2d at 106 (*quoting Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983)); *Brumback,* 913 F.Supp. at 939. *See also Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1131–32 (4th Cir. 1995) (reversing grant of summary judgment in part because court "[could not] say that [Defendant's response to national origin harassment] was, as a matter of law, reasonably calculated to end the harassment."). I am persuaded that reasonable minds could only find that DOJ's efforts to end Employee No. 1's harassment of Bissell were "reasonably calculated to end the harassment." *Id.*

I turn now to the facts. Bissell had been warned to keep away from Employee No. 1 even before Bissell transferred into Computer Operations. *Bissell I* at 49. Employee No. 1 was notoriously difficult. *Mathis I* at 12–14; *Lewis* at 111. Indeed, Cureton, Chief of Computer Operations, *Cureton I* at 8, and other supervisors, had attempted on several occasions to counsel this employee and to warn her that her abusive language and disrespectful behavior toward fellow employees would not be tolerated.. DOJ Ex. 9 at 2. Employee No. 1 was suspended without pay for four days for such behavior on one occasion. Subsequently, on February 5, 1993, Cureton issued Employee No. 1 a reprimand letter indicating that she would again be suspended for "abusive language/disrespectful behavior" toward another employee. After her union intervened on her behalf, and after she' agreed to undergo counseling and to desist from this behavior, Employee No. 1 was not suspended. DOJ Ex. 10 at 2.

Bissell initially avoided Employee No. 1, but they began to have trouble beginning sometime in April 1993 when Employee No. 1 was assigned for an extended time to the Console Area as an accommodation to her recovery from carpal tunnel syndrome. *Bissell I* at 49, 624. According to Bissell, for a period of six months, from approximately April to September 1993, this employee often intercepted her telephone calls, which all came in through the Console Area. *Bissell I* at 623.

---

18. Courts evaluating racial harassment claims often turn to the standards enunciated in the prolific body of law relating to sexual harassment. *E.g., Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir.1991); *Brumback v. Callas Contractors, Inc.,* 913 F.Supp. 929 (D.Md. 1995).

On April 22, 1993, an incident occurred between Employee No. 1 and Bissell to which Bissell and DOJ each accord great significance. Employee No. 1 told Bissell to move her work to the other side of the table where she was working in the Console Area so that Employee No. 1 could have her seat. *Bissell I* at 54–55. Bissell went to her supervisor, Brown, and told him that Employee No. 1 had told her to "move my ass to the other side of the table," although Bissell later acknowledged that those were not the words Employee No. 1 had used. *Bissell I* at 55. Employee No. 1 was upset when she heard that Bissell had told Brown that she had used profanity and she denied that this is what she had said. *Bissell I* at 56. Brown told Employee No. 1 and Bissell that they should try to resolve their differences outside of the workplace. At this point, Employee No. 1 told Bissell she would meet Bissell anywhere she wanted, even her gym. *Bissell I* at 56, 60–61. Bissell interpreted this comment as a threat of physical harm. *Id.;* DOJ Ex. 9 at 1. Brown told them to "stop right now" and return to their work areas. *Bissell I* at 56.

On April, 28, 1993, DOJ Ex. 9, while Bissell was assigned to the Micrographics Area, she attempted to have her union representative, Balesh, come meet with her because she was upset about DOJ's response to the April 22 incident. *Bissell I* at 102. Balesh told her that Bissell had to have permission from her supervisor, and so Bissell telephoned Brown at the Console Area. Employee No. 1 answered the phone, stated that Brown was not there and that she could not get in touch with him. *Id.* at 103. Bissell then walked into the Tape Area and told Brown she had tried to phone him and asked whether Balesh could come down and talk to her. Bissell followed Brown back to the Console Area where he reprimanded Employee No. 1 for not paging him when he had a phone call. Employee No. 1 replied that she had been busy talking on the phone, and Bissell volunteered that none of the other phone lines had been lit at the time. *Id.* at

103–04. With that, Employee No. 1 became upset and told Bissell that she was "the dumbest white women that she has ever known." *Id.* at 104. Employee No. 1 made this and other "similarly inappropriate remarks relating to Ms. Bissell's race and gender" in a loud and angry tone of voice. DOJ Ex. 9. Brown attempted to interject but "could not stop" Employee No. 1, and so he instead escorted Bissell out of the Console Area and back to Micrographics. *Bissell* I at 104.

On May 18, 1993, Cureton presented a letter to Employee No. 1 giving her notice that proceedings pursuant to the Civil Service Law had been instituted to suspend her without pay for fourteen days as a sanction for her use of "offensive language/disrespectful conduct toward a coworker." DOJ Ex. 9 at 1. Cureton's letter detailed the incidents of April 22 and April 28 as the basis for the reprimand, explaining that the incident of the 22nd had caused Bissell to feel seriously threatened. DOJ Ex. 9 at 2. Cureton's letter explained that Employee No. 1 had made disparaging remarks about Bissell's race and gender, that she had made such remarks previously to other employees, and that such remarks would not be tolerated. This letter also detailed previous measures DOJ had taken to improve Employee No. 1's treatment of her coemployees. *Id.*

On June 30, 1993, Melvin Wiggins, Assistant Director of Computer Services Staff, issued a decision, noted Employee No. 1's arguments on her behalf against the suspension, and imposed a seven day suspension to begin July 1, 1993. DOJ Ex. 10. Bissell claims she did not learn about Employee No. 1's suspension, or of any of the disciplinary measures taken against her, until Bissell's deposition on March 21, 1996. *Bissell I* at 106.

After the incidents of April, Bissell was assigned to work with Employee No. 1 less frequently; Bissell assumed this was because management knew she was upset by her interactions with Employee No. 1. *Bis-*

*sell I* at 47. Bissell alleges, and I assume to be true, that Employee No. 1 thereafter did not socialize with Bissell, which she interpreted as "shunning." Bissell also claims that Employee No. 1 caused other employees to socialize less with her. *Bissell I* at 82–85, 600–02. Bissell alleges that Employee No. 1 often bumped against Bissell's chair when walking past her. *Bissell I* at 599. Lewis, Bissell's supervisor, asked Bissell several times why she chose to continue parking her car next to Employee No. 1's car in the agency parking lot if Bissell was so afraid of this employee, spots were not assigned, and there were plenty of open spaces elsewhere. *Bissell I* at 601–02. Bissell eventually changed her customary parking spot to be farther away from Employee No. 1's car, despite the fact that she was not "afraid of [Employee No. 1's] empty car." *Bissell I* at 602. Bissell alleges that Employee No. 1 often interrupted her training sessions with Supervisor Lewis to ask questions which a Senior Operator should already know. *Bissell I* at 591. Employee No. 1 retired in October 1994. Complaint ¶ 57.

 I evaluate each aspect of Bissell's allegations of continuing harassment as evidence of DOJ's inadequate response to Employee No. 1's harassment. One of the main aspects of Bissell's claim of inadequate employer response to known harassment is that while suspension proceedings were pending against Employee No. 1 and after her suspension, Employee No. 1 "shunned" Bissell and caused other employees to socialize less with Bissell. However, Bissell's explanation of what she considered "shunning" amounted to an understandable curtailment of socializing between Employee No. 1 and Bissell as a result of the disciplinary proceedings. Bissell nowhere alleges that Employee No. 1 ever refused to engage in communications that were necessary for the accomplishment of work. This is not "shunning" as that term is used in the discriminatory harassment context. *See Munday v. Waste Management of North America,*

*Inc.,* 126 F.3d 239, 243 (4th Cir.1997) (evidence that employer instructed co-employees not to socialize with plaintiff in sex harassment case and subsequent lack of social intercourse with coworkers was *per se* insufficient to make out retaliation claim under Title VII).

Bissell cites two examples as evidence of her claim that Employee No. 1 caused other employees to shun her as continuing harassment once the disciplinary proceedings had commenced following the April 28, 1993 incident. She alleges that sometimes when she would approach a small group of coworkers who were socializing, Employee No. 1 among them, they would cease talking upon Bissell's approach, and Employee No. 1 would remark, "Here she comes; we can't talk about this anymore." *Bissell I* at 84. Here again, a curtailment of socializing between the accused harasser and the victim of harassment is to be expected once disciplinary proceedings are instituted. Indeed, were there no curtailment, the victim could use continued socializing as evidence of the inefficacy of the disciplinary measures. Bissell does not allege that her coemployees refused to communicate with her about matters necessary for accomplishing work, and she offers no evidence about curtailment of socializing with coworkers when Employee No. 1 was not present.

 Her second example of "shunning" by coworkers was an incident in which a coworker came to socialize with Bissell in Micrographics when Employee No. 1 was working in the Console Area. As Bissell and her friend were chatting, Employee No. 1 called over the intercom demanding that Bissell's friend report to the Console Area. *Bissell I* at 600–01. Bissell interpreted this call as an effort by Employee No. 1 to isolate her; it could have been that her fellow employee was needed for a job in the Console Area. In any event, this one isolated instance is insufficient to show "shunning" by coworkers.

The other examples that Bissell cites are likewise inadequate to show that DOJ's

disciplinary measures were ineffective in curbing the harassment. Being asked not to park next to one's alleged harasser's car, when parking is not assigned, and the alternative parking spot is not disadvantageous in any way, *Bissell I* at 601–02, does not constitute harassment.

While it was certainly not pleasant for Bissell to have had to continue to see Employee No. 1 after the incidents in April, DOJ could not legally bypass the merit system procedures for disciplining an employee. Bissell requested a transfer away from Computer Operations so that she would not have to work with Employee No. 1, but DOJ told her that there was no alternative position for her. *Bissell I* at 438. She was offered the opportunity to work the night or evening shifts in order to avoid further contact, but she declined because she did not want to be away from her son. *Bissell I* at 86. DOJ did attempt to keep Bissell and Employee No. 1 separate by assigning them to work together less frequently, *Bissell I* at 47, but while they were both in Computer Operations, some further contact was unavoidable.

Bissell claims, and I assume to be true, that she did not learn that DOJ was engaging or had engaged in any discipline of Employee No. 1 until four or five years after the fact. *Bissell I* at 106. Thus, she claims that the hostile environment was exacerbated because she believed that her supervisors were refusing to discipline her harasser because her harasser was black, and her supervisors were black and Bissell was white. She also claims that she believed that her supervisors were refusing to remedy the harassment because they held animus against Bissell because of her disability. But the record reflects unambiguously that her supervisors did take prompt and effective remedial action. They were restricted in what they could tell Bissell by Privacy Act protections of information regarding the disciplining of another employee. 5 U.S.C. § 552a(b) (conditions of permitted disclosure of federal employee information) and (g) (providing civil remedies for breach of privacy guarantees in (b)). In any event, an employee's erroneous assumption that the employer is not invoking discipline against a harasser does not make the employer's actual discipline inadequate. *Cf. Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987) (when harasser told victim he was assigned to work at the desk next to her indefinitely, it was not reasonable for her to assume that to be true and quit; she had to give the employer the opportunity to intervene).

For all of these reasons, I am persuaded that no reasonable juror could conclude by a preponderance of the evidence that DOJ's response to Employee No. 1's actions was inadequate. To the contrary, progressive disciplinary measures having failed to deter the alleged harasser from continued inappropriate acts, DOJ's decision to respond to Bissell's complaint by suspending Employee No. 1 was effective as a matter of law.[19]

(vi)

For the reasons discussed above, I shall grant DOJ's Motion to Dismiss and/or for

---

19. Bissell also alleges an ostensible retaliation claim in which she alleges that DOJ allowed Employee No. 1 to return to Computer Operations in June 1995, several months after she had retired. Specifically, she alleges that Employee No. 1 used the intercom to instill fright and fear in Bissell. *Complaint* ¶ 94. In response to DOJ's Motion, Bissell states merely, "The facts and arguments noted *supra*, support her reprisal claim." *Bissell's Response* at 39. The statement of facts of Bissell's Response recites essentially the same facts mentioned in her complaint, but cites no evidence to support these assertions. Under Rule 56 "an adverse party may not rest upon the mere allegations or denials of the [their] pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Accordingly, this claim is deemed abandoned and summary judgment is granted to DOJ.

Summary Judgment. I dismiss the complaint with prejudice as against the individual defendants Gilbert Brown and Douglas F. Cureton and grant summary judgment to DOJ on all counts. I shall deny Bissell's Cross Motion for Summary Judgment. A separate order follows.